IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MICHELLE LINDNER LOOS, | ) |
| | ) |
| Plaintiff, | )   4:08CV3241 |
| | ) |
| v. | ) |
| | ) |
| JANET NAPOLITANO, Secretary, | )   MEMORANDUM AND ORDER |
| Department of Homeland Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff's only remaining claim[1] is that Defendant failed to provide Plaintiff with training as a reasonable accommodation for her learning disability (induced by epilepsy). That claim is founded upon the Rehabilitation Act. Defendant has filed a motion for summary judgment (filing 40), an index of evidence (filing 41) and a supporting brief (filing 42). Plaintiff has not responded. The motion will be granted and this case will be dismissed with prejudice.

### *I. FACTS*

Drawn almost entirely from Defendant's statement of undisputed facts (filing 42 at CM/ECF pp. 3-16), which have not been controverted by Plaintiff, I independently find the following to be the material undisputed facts:

*Parties and Claim*

1. Plaintiff resides in the State of Nebraska (Filing 1, Complaint at paragraph 1 (hereinafter "Comp. ¶ __")). She claims to be "a qualified

---

[1]*See* filing 36 (granting a partial motion to dismiss).

individual with a disability" who could perform the essential functions of the positions of "exams clerk . . . so long as she is given the training in a form that comports with her learning disability, which is a reasonable accommodation." (Comp. ¶ 16).

2. Defendant Janet Napolitano is Secretary of the Department of Homeland Security. The U.S. Citizenship and Immigration Service Center (hereinafter "the Agency"), previously known as the Office of Immigration and Naturalization Services, is an agency of the Department of Homeland Security (Comp. ¶ 2 and Caption; Filing 10, fn. 1).

*Plaintiff's Education and Previous Work History*

3. Plaintiff graduated from high school in 1997 and completed three semesters of college at Concordia College in Seward (Deposition of Michelle R. Lindner Loos at page 11, lines 16-21 and page 13, lines 12-15, attached to Defendant's Index of Evidentiary Materials submitted in support of Defendant's Motion to Dismiss (hereinafter, "Pl.'s Depo. page:line")).

4. After college, Plaintiff worked for Walmart as a cashier. In March 2001, Plaintiff was terminated from Walmart because she could not meet production requirements. Specifically, she was not scanning enough items per hour. (Pl.'s Depo. 16:13-23; 17:5-24 and Ex. 9).

5. In July 2001, Plaintiff went to work for Technology Systems, which later changed its name to SCOT (hereinafter, "SCOT") (Pl.'s Depo. 17:25 - 18:7). SCOT contracted with Defendant to provide clerical services (Plaintiff's Responses to Defendant's Interrogatory number 9,

Attachment B to Declaration of Lynnett M. Wagner, attached to Defendant's Index of Evidentiary Materials submitted in support of Defendant's Motion for Summary Judgment (hereinafter, "Interrog. No. __"); Declaration of Charity Masters at paragraph 1, attached to Defendant's Index of Evidentiary Materials submitted in support of this motion (hereinafter "Masters Decl. ¶ __").

6. Plaintiff's initial job at SCOT was to assemble files, including refuge applications, scan files, and enter data (Pl.'s Depo. 18:12-23).

7. Plaintiff failed to meet SCOT's expectations for processing applications because she worked at a slower pace (Pl.'s Depo. 28:23 - 29:25). SCOT reassigned Plaintiff to the job of putting boxes on shelves (Pl.'s Depo. 32:25 - 33:4).

8. Plaintiff worked at SCOT until she was hired by Defendant (Pl.'s Depo. 23:1-5).

*Plaintiff's Employment with Defendant*

9. On or about December 10, 2002, Plaintiff applied for an Examinations Clerk GS- 4/5 position (Pl.'s Depo. 42:14 - 43:3 and Ex. 7). Plaintiff was familiar with a number of things through her experience with SCOT, including the computer systems and some of the forms (Pl.'s Depo. 18:24 - 20:15; 22:9-25; 43:13 - 46:10 and Ex. 8).

10. An Examinations Clerk's major duties are defined in the position description (Pl.'s Depo. 42:9 - 43:3 and Ex. 7). These duties include, in part, processing more than 30 different types of immigration applications and petitions; typing in the final form of formal orders (i.e.,

-3-

denials, letters of intent to deny or revoke, revocations, motions to reopen or reconsider, etc.); initiating, keying, and mailing certain orders without further review; updating file movement in the computerized file management and tracking system; and comparing data on different forms to confirm an applicant's identity (Pl.'s Depo. Ex. 7, p. 2). The position description states that "[a]ccuracy and timely completion of assignments contributes to the effectiveness of the unit, the Service Center, and quality service to the general public." (Pl.'s Depo. Ex. 7, p. 4). The work processed through NSC is under timeframes established by Congress, and an Examinations Clerk's ability to efficiently process applications has a direct impact on NSC's ability to timely adjudicate applications and petitions for Immigration benefits and to provide good service to the public (Pl.'s Depo. Ex. 7, p. 7; Masters Decl. ¶ 5).

11. Other than a minimal amount of time allowed to check e-mail, the Examinations Clerks spent 100% of their time processing applications and petitions. In 2003 and 2004, NSC was significantly understaffed and regularly experienced a backlog for which overtime was routinely authorized. (Masters Decl. ¶ 6).

12. If an Examinations Clerk's productivity was low, other Clerks had to pick up additional work, often resulting in delay in responding to the public's requests and/or additional overtime expenses. In addition, most Examinations Clerks worked a variety of forms, some basic and some more complicated. If an Examinations Clerk worked only the basic forms, other Examinations Clerks had to do the more complex forms, which might lower their overall production rates and decrease employee morale (Masters Decl. ¶ 7).

13. Plaintiff was hired by Defendant on March 23, 2003, as an Examinations Clerk, GS-0303, Grade 4. Her position was a competitive, term position. A term position is from one to four years duration (Comp. ¶ 10; Filing 17-1, Declaration of Randy Frazier at paragraphs 3, 4 and Attachment A, (hereinafter, "Frazier Decl. ¶ ___, Attch. ___"); Pl.'s Depo. 47:8-10). Plaintiff was subject to a one-year trial (probationary) period (Filing 17-1, Frazier Decl. ¶ 4, Attch. B). The probationary period is an extension of the hiring process, which tests a new employee's actual performance on the job. An employee who fails to demonstrate fitness or qualifications for continued employment can be terminated (Pl.'s Depo. Ex. 12, Section 1-7).

14. Plaintiff understood her position was a term position, subject to a trial period (Pl.'s Depo. 48:12 - 49:19, 49:20 - 52:24, 53:17 - 54:22, and Ex. 10, 11, 12).

15. Plaintiff's Supervisor was Charity Masters, Supervisory Examinations Clerk. Her second line supervisor was Neil Jacobson, Assistant Center Director (Pl.'s Depo. 54:23 - 55:1; Masters Decl. ¶ 3).

*Training Provided to Plaintiff*

16. Patricia Aksamit was the primary training instructor for Examinations Clerks during Plaintiff's employment (Masters Decl. ¶ 10). Plaintiff received a mixture of classroom training, one-on-one training, and hands-on-training. In addition, she was provided training manuals with step-by-step instructions, referred to as Standard Operating Procedures (SOPs) (Pl.'s Depo. 58:1-11; Masters Decl. ¶ 10). Plaintiff asked questions of her supervisor, Instructor Aksamit, and other Examinations Clerks (Pl.'s Depo. 110:23 - 111:17; Masters Decl. ¶ 17, 42, 44).

17. On or about March 26, 2003, Plaintiff received training from Instructor Aksamit on Regular Requests For Evidence (RFE) (Masters Decl. ¶ 12; Plaintiff's Response to Defendant's Request for Admission number 1(a), Attachment B to Declaration of Lynnett M. Wagner, attached to Defendant's Index of Evidentiary Materials submitted in support of Defendant's Motion for Summary Judgment (hereinafter, "Admission No. __"). A RFE was a letter asking an applicant for more information (Pl.'s Depo. 64:19-23). Plaintiff was given a training guide with step-by-step instructions on how to process Regular RFE files (Pl.'s Depo. 61:25 - 62:3; Admission No. 2; Masters Decl. ¶ 10, 12). Following the training, Plaintiff was given RFE files to complete at her desk. She asked questions and was able to complete the files (Pl.'s Depo. 62:16 - 64:6). RFEs were one of the two forms that Plaintiff was most comfortable with (Pl.'s Depo. 75:2-5).

18. On or about April 9, 2003, Plaintiff received Introduction to Computer training by Instructor Rexroat (Masters Decl. ¶12; Admission No. 1(b)).

19. On or about April 10, 2003, Plaintiff received Introduction to Adjudications training by Instructor Rexroat (Masters Decl. ¶ 12; Admission No. 1(c)).

20. On or about May 1, 2003, Plaintiff was having difficulties passing a certification test that was necessary for her to receive a password to the Interagency Border Inspection System (IBIS). IBIS was used to conduct background checks on applicants, which was necessary to perform almost all of an Examinations Clerk's tasks. Supervisor Masters sat with Plaintiff and printed off screen shots of questions Plaintiff missed so that Plaintiff could use them to study and retake the test. In addition, Plaintiff was provided one-on-one training by John Tiedt to assist her in

passing the certification test. Plaintiff passed the certification test shortly thereafter. (Masters Decl. ¶ 24).

21. On or about May 6, 2003, John Tiedt provided one-on-one training to Plaintiff to show her how to conduct a background check in IBIS (Masters Decl. ¶ 25).

22. On or about May 8, 2003, Plaintiff received one-on-one training on I-485 RFE Priority Processing from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(d)). Plaintiff was given a training guide with step-by-step instructions on how to process I-485 RFE Priority files (Pl.'s Depo. 66:15-23; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff was given a box of I-485 RFE Priority files to work following her training and was able to ask questions. After completing about 20 files, Plaintiff felt she could do the work and did not need any more training. (Pl.'s Depo. 67:12 - 70:1).

23. On or about May 14, 2003, Plaintiff received Abandonment Training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(e)). Plaintiff received a training guide with step-by-step instructions on how to process Abandonment files (Pl.'s Depo. 75:9-18; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff became comfortable with Abandonment files after processing about 20 files (Pl.'s Depo. 75:19 - 76:8).

24. On or about May 19, 2003, Plaintiff received I-89 Process training from Instructor Aksamit (Masters Decl. ¶ 12; Pl.'s Depo. 80:9-16; Admission No. 1(f)). Plaintiff received a training guide with step-by-step instructions on how to work I-89 Process files (Pl.'s Depo. 80:9- 16 and Ex. 22; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff testified she

was comfortable with I-89 Process files after working about 20 files (Pl.'s Depo. 80:20 - 81:1).

25. On or about June 10, 2003, Plaintiff received IBIS Alias training from John Tiedt (Masters Decl. ¶ 12; Admission No. 1(g)). After receiving IBIS Alias training, Plaintiff was able to complete IBIS Alias files (Pl.'s Depo. 87:4-14).

26. On or about June 16, 2003, Plaintiff received I-140 Concurrently Filed Process training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(h)). Plaintiff received a training guide with step-by-step instructions on how to process I-140 Concurrent Process files (Pl.'s Depo. 72:6-14; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff was able to complete the I-140 Concurrent Process files after asking questions (Pl.'s Depo. 73:9 - 75:1).

27. On or about June 30, 2003, Plaintiff received ROP Assembly training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(i)). Plaintiff received a training guide with step-by-step instructions on how to process ROP Assembly files (Pl.'s Depo. 81:20 - 82:2; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff testified that she became comfortable with ROP Assembly files after working approximately 20 files (Pl.'s Depo. 82:10-22).

28. On or about July 8, 2003, Plaintiff received Premium RFE using Fax Press training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(j)). She was the only Clerk in the training (Admission No. 1(j)). Plaintiff received a training guide with step-by-step instructions on how to process Premium RFE files using Fax Press (Pl.'s Depo. 78:17-24; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff testified that she

was comfortable completing Premium RFE files using Fax Press (Pl.'s Depo. 78:25 - 79:9).

29. After the July 8, 2003 training on Premium RFE files, Supervisor Masters wanted to make sure Plaintiff understood the process, so she arranged for Plaintiff to receive one-on-one training with Instructor Aksamit. Instructor Aksamit told Supervisor Masters that Plaintiff struggled with Premium RFE files and that she was concerned with Plaintiff's ability to work them. Supervisor Masters asked Instructor Aksamit to continue to work with Plaintiff until she was satisfied that Plaintiff understood the process. Instructor Aksamit worked with Plaintiff for another week.

30. On or about August 1, 2003, Plaintiff received Abandonment Letter Process training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(k)). Plaintiff received a training guide with step-by-step instructions on how to process Abandonment Letters (Pl.'s Depo. 76:13-19; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff testified that she became comfortable with the Abandonment Letter process (Pl.'s Depo. 76:20 - 77:11).

31. On or about August 12, 2003, Plaintiff received Straight Signed Denials and Intents training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(l)).

32. On or about September 16, 2003, Plaintiff received training on Fraud, Waste, and Abuse (Masters Decl. ¶ 12; Admission No. 1(m)).

33. On or about October 10, 2003, Plaintiff received I-212/237 Residence Training from either Jeremy Potter or Lois Benson (Masters Decl. ¶ 12; Admission No. 1(n)).

34. On or about January 12, 2004, Plaintiff received Non-Decisional Denial training from Instructor Aksamit (Masters Decl. ¶ 12; Admission No. 1(o)). Instructor Aksamit stated she asked for ten to fifteen cases to review and it took Plaintiff three to four days to get them to her (Masters Decl. ¶ 16 and Attch. A). Plaintiff received a training guide with step-by-step instructions on how to process Non-Decisional Denial files (Pl.'s Depo. 77:20-23; Admission No. 2; Masters Decl. ¶ 10, 12). Plaintiff testified that she was "somewhat" comfortable working Non-Decisional Denial files, but felt they were more complex (Pl.'s Depo. 77:24 - 78:12).

*Plaintiff's Alleged Disability and Request for Accommodation*

35. Plaintiff contends that during her quarterly performance appraisals, after Supervisor Masters raised concerns regarding Plaintiff's performance, Plaintiff provided Supervisor Masters with copies of two documents from her physician, which consisted of: a. A prescription note dated October 17, 2002, by Richard Torkelson, M.D. stating Plaintiff "may need at least 4 months to learn a new job." (Pl.'s Depo. Ex. 6). b. A letter dated September 24, 2001, by Richard Torkelson, M.D. that Plaintiff has a history of epilepsy and had several surgeries which allowed control of her epilepsy with medication. Plaintiff requires repetition to master tasks, and that her ability to rapidly process information and her productivity are slowed (Pl.'s Depo. Ex. 4). (Pl.'s Depo. 99:15 - 101:5, 102:9 - 105:14, and Ex. 4 & 6; Interrogatory No. 3).

36. Plaintiff did not provide any other medical or other documentation to Defendant (Pl.'s Depo. 100:13 - 106:10; Masters Decl. ¶ 39).

37. Plaintiff had no seizures while she was employed by Defendant (Pl.'s Depo. 98:2- 4). Plaintiff stated her impairment did not affect the type of work that she could do, and she was able to work with the public and on the computer (Pl.'s Depo. 93:25 - 94:8).

38. Plaintiff told Supervisor Masters that it took her longer to learn things (Masters Decl. ¶ 39). Plaintiff did not request any specific accommodation from Supervisor Masters, other than she needed one-on-one training on some new forms (Pl.'s Depo. 101:11-25; 103:6-10; 104:18 - 105:25; 106:7-10). Plaintiff defined "one-on-one" training as when someone would sit with her to go through forms, rather than listening to someone teach it (Pl.'s Depo. 94:25-95:3).

39. Plaintiff did not request accommodation from anyone at NSC other than Supervisor Masters and Virginia Belzer, the Union Representative. Plaintiff does not recall what she requested of Ms. Belzer. (Pl.'s Depo. 106:11-24).

*Plaintiff's Production, Discussions Regarding Production,
and Subsequent Termination*

40. Throughout her employment with Defendant, Plaintiff consistently averaged a production rate of only two forms per hour, while an average production rate of ten or more forms per hour was expected (Masters Decl. ¶ 22, 28, 29, 31, 32, 35, 36). Plaintiff had the lowest production rate of all Clerks supervised by Charity Masters (Masters Decl. ¶ 22, 28, 30, 32, 33, 36). Her production rate was approximately one-fifth that of

other Clerks (Masters Decl. ¶ 22, 35, 48, Attch. E) and was not acceptable to NSC management (Masters Decl. ¶ 31, 32, 33, 35, Attch. E).

41. Plaintiff had the same essential functions as the other Examinations Clerks. During her employment, she worked on a number of different types of forms; however, she primarily processed the most basic forms. Most Clerks prefer to process these forms because they typically have higher production rates when performing these basic tasks. (Masters Decl ¶ 8).

42. In an attempt to help Plaintiff to increase her production, Supervisor Masters decided to slow the typical progression of training for Examinations Clerks and hold Plaintiff from any new training so that she could focus on the forms she had already been trained on (Pl.'s Depo. 103:17 - 104:13; Masters Decl. ¶ 15, 26, 34). When Supervisor Masters told Plaintiff she was going to hold her back from new training, Plaintiff told Supervisor Masters that she did not care if she was trained on anything else or not. Plaintiff laughed and smiled, which Supervisor Masters interpreted to mean that Plaintiff thought it was funny that she was not going to have to learn anything new (Masters Decl. ¶ 15, 26).

43. On or about February 19, 2004, Supervisor Masters noticed several boxes of files stacked below Plaintiff's desk. The boxes contained a number of old files that had been received by Plaintiff several weeks earlier. Supervisor Masters was very concerned because a number of the files were time sensitive. Supervisor Masters asked Plaintiff why the files were still at her desk and she indicated that she was unable to get to them. Supervisor Masters told Plaintiff to stop taking new work until

the files on her desk were completed. (Masters Decl. ¶ 38; Pl.'s Depo. 116:19 - 117:5).

44. Plaintiff was given significantly more training and assistance than that given to the other Examinations Clerks (Masters Decl. ¶ 17).

45. Supervisor Masters observed Plaintiff talking to other Examinations Clerks and talking on her cell phone during times she was supposed to be working (Masters Decl. ¶ 41). In addition, other Examinations Clerks complained that Plaintiff bothered them with questions and personal conversations, which affected their productivity (Pl.'s Depo. 110:23 - 111:1; Masters Decl. ¶ 42). Plaintiff's interruptions got so bad that one Examinations Clerk asked to be moved further away from Plaintiff (Masters Depo. ¶ 43, 46). This occurred during times when Supervisor Masters had to take work away from Plaintiff and give it to other Clerks because Plaintiff was not getting her work done (Masters Decl. ¶ 41). Supervisor Masters discussed the complaints from other Clerks with Plaintiff, instructing Plaintiff to bring questions to either Supervisor Masters or Instructor Aksamit (Masters Decl. ¶ 42, 44). Supervisor Masters specifically told Plaintiff not to go to other Clerks with questions and to limit visiting to lunch and breaks (Masters Decl. ¶ 44). Despite Supervisor Master's instructions, Plaintiff continued to go to other Clerks with questions and personal conversation (Masters Decl. ¶ 45).

46. Plaintiff received quarterly performance reviews conducted by Supervisor Masters. These were held on or about April 23, 2003, September 9, 2003, and January 13, 2004. (Masters Decl. ¶ 23 and Attch. B). Each time Plaintiff was counseled regarding her low production rate and performance expectations were discussed (Masters

Decl. ¶ 23, 30, 32). In preparation for the January 2004 review, 33 of Plaintiff's files were reviewed by Supervisor Masters. The files had a 98.83% accuracy rate, which is below the "minimally satisfactory" rating level (Masters Decl. ¶ 32, Attch. B, p. 6 (labeled as p. 8 on the top of the page)).

47. On or about July 23, 2003, Plaintiff requested a pay increase from GS-4 to GS-5. Plaintiff justified her request with a list of forms she had been trained on and was able to complete (Pl.'s Depo. 91:18 - 92:10, Ex. 26; Masters Decl. ¶ 27). Plaintiff testified that at the time she requested the pay increase, she did not need any more training on the eight forms listed (Pl.'s Depo. 92:1-6). Supervisor Masters supported Plaintiff's request for a pay increase because Plaintiff had been trained on GS-5 work and it was common practice to promote Examinations Clerks after they received a certain level of training. Additionally, there was no minimum production rate to receive the promotion. (Masters Decl. ¶ 27). On or about August 10, 2003, Plaintiff was promoted to GS 5, Step 1 (Masters Decl. ¶ 27).

48. In or around January 2004, Supervisor Masters met with Susan Copeland, Assistant Center Director of NSC Administration Unit, and determined the best course of action for Plaintiff was termination within the probationary period (Masters Decl. ¶ 47).

49. On or about February 17, 2004, NSC set minimum production rates necessary for Clerks to work overtime. Clerks were required to be able to process ten to fifteen I-89 files per hour and ten to fifteen RFE files per hour to be eligible to work overtime (Masters Decl. ¶ 37).

50. On or about February 25, 2004, Supervisor Masters recommended that Plaintiff's employment be terminated, noting that Plaintiff's production was approximately one-fifth the production of other Clerks during the same time. Supervisor Masters felt that NSC had done everything possible to help Plaintiff improve her productivity and that Plaintiff complicated the efforts by socializing during work hours. Supervisor Masters felt Plaintiff did not put 100% effort into her work and was not putting forth the necessary effort to increase her productivity. (Masters Decl. ¶ 48 and Attch. E).

51. The recommendation for termination was supported by Supervisor Jacobson and endorsed by Gregory W. Christian, Deputy Director of the Nebraska Service Center (Masters Decl. ¶ 49, 50).

52. On or about March 15, 2004, Plaintiff was given written notice that she was being terminated within her one year probationary period for failure to meet performance standards, and disruption of work unit due to excessive socializing (Filing 17-1, Frazier Decl. ¶ 5, Attch. C).

53. Because of Plaintiff's low productivity and the decision to hold off on any new training in the attempt to improve Plaintiff's productivity on the forms she was already trained on, Plaintiff was not trained on a number of functions that most Examinations Clerks learned in their first year (Masters Decl. ¶ 52).

54. Plaintiff testified that her productivity was less than that of other Examinations Clerks (Pl.'s Depo. 114:19-23).

55. Plaintiff testified that regardless of how much training she had, she would not process files as fast as other Clerks, and that no amount of training would have changed that:

> Q. So, if I'm correct, because of your impairment, you could not process files as fast as the other clerks; is that correct?
> A. Yes.
> Q. And regardless of how much training you had, because of your impairment you could not process files as fast as the other clerks?
> A. Correct.
> Q. And no amount of training is going to change that; is that true?
> A. Yes.

(Pl.'s Depo. 115:14-24).

## *II. LAW*

Defendant argues that Plaintiff cannot establish a prima facie case of disability discrimination: (1) because she cannot establish that she was "disabled" within the meaning of the Rehabilitation Act; and (2) because she cannot establish that she was qualified (with or without reasonable accommodation) to perform the essential functions of the job.[2] I am easily persuaded by the second argument, and find it unnecessary to resolve the first.

---

[2]The Rehabilitation Act incorporates standards from the ADA and Title VII. (Filing 36 at CM/ECF p. 3 (collecting cases)).

If a person claims that she is disabled and requires accommodation, she still must show that the sought after assistance would allow her to perform the essential functions of that job. *See, e.g., Burchett v. Target Corp*, 340 F.3d 510, 516-517 (8th Cir. 2003) (affirming grant of summary judgment; holding that in order to show that disabled employee is otherwise qualified to perform the essential functions of her job, the employee must show that she meets the necessary prerequisites for the job, and that she can perform the essential functions; if the employee establishes that she cannot perform the essential functions of the job without accommodation, she must show that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job).

Here, the evidence establishes beyond any question that Plaintiff could not and did not perform the essential functions of her job. Furthermore, it is undisputed that she was given a lot of training. In fact, she received more training than her peers. Even with that training, Plaintiff could not perform the essential parts of her job.[3] No reasonable finder of fact could conclude otherwise. Accordingly, summary judgment must be granted.

IT IS ORDERED that:

1. Defendant's motion for summary judgment (filing 40) is granted.

2. A separate judgment will be entered dismissing this matter with prejudice.

DATED this 16th day of April, 2010.

---

[3]Of course, it did not help that Plaintiff refused to stop socializing.

BY THE COURT:

*Richard G. Kopf*
United States District Judge